## E. P. VANDERCOOK CO. v. WILMANS CO.

Court of Appeal, First District; September 21, 1906.

### 87 Pac. 1116.

**Broker.**—In an Action for Compensation for the Sale of real estate, evidence held sufficient to sustain findings that the plaintiff procured a purchaser who was ready, able and willing to purchase, and thereby completed its services and earned its commission.

**Broker—Right to Commissions—Necessity for Actual Sale.**— Under a contract whereby the owner of land gave plaintiff exclusive authority to sell it and agreed to pay a commission on any amount for which the property should be sold, the plaintiff was entitled to his commission on procuring a purchaser able, ready and willing to purchase though the sale was not actually completed.

APPEAL from Superior Court, Alameda County; Henry A. Melvin, Judge.

Action by the E. P. Vandercook Company against the Wilmans Company. From an order denying defendant's motion for a new trial he appeals. Affirmed.

John S. Partridge for appellant; Snook & Church for respondent.

COOPER, J.—This action was brought to recover $791.87 as commissions for the sale of real estate under a written contract. The case was tried before the court, findings filed, and judgment ordered and entered for plaintiff. Defendant has appealed from the order denying its motion for a new trial. The court found that, pursuant to the authorization contained in the contract, the plaintiff procured a purchaser for the lands therein described who was ready, able and willing to

purchase, and thereby completed its services and earned its commissions. The defendant contends that the evidence does not support the findings of the court in this regard. The findings are conclusive upon us if there is substantial evidence to support them, even though the evidence may be conflicting or may preponderate in favor of defendant.

The defendant was, at the times mentioned in the pleadings and findings, a corporation. Its capital stock was divided into three hundred shares, and was at the time the contract was made owned and held by J. M. Wilmans, F. W. Wilmans, Lillian W. Wilmans, Clara E. Wilmans, and Martha J. Wilmans. J. M. Wilmans was the secretary and managing agent, and owned two-thirds of the shares of the capital stock of the corporation. Its assets consisted of about fourteen hundred acres of land situate in Stanislaus county in this state. The managing agent of defendant, J. M. Wilmans, spoke of the defendant's property as his own land and as being mortgaged for $75,000, or, in his language: "I owed $75,000 on the whole property." There is evidence to the effect that on May 21, 1903, Merle, the agent of plaintiff, was in Stanislaus county with one Witcher, who was looking at lands with a view of purchasing, and Merle was showing Witcher different tracts of land. They saw the lands belonging to the defendant, and Witcher seemed to be pleased with them, and to desire to purchase them, or at least a part of the land owned by the defendant. Merle procured from defendant, through J. M. Wilmans, its agent, with admitted power to act, a contract in writing, authorizing the plaintiff, exclusively, to sell a tract of land described therein, containing three hundred and ten acres, at $100 per acre, and another lot containing two and one-quarter acres at $300 per acre. The contract contained the clause: "If said property is sold, or a purchaser is found by E. P. Vandercook Co., or through their agency, we agree to pay the said E. P. Vandercook Co. 2½ per cent. commission on any amount for which said property shall be sold." The contract was to continue for one month from date, May 21, 1903, and was continued by written extensions to July 20, 1903. It contained a clause that it should be irrevocable until withdrawn by written notice.

Merle testified that he showed the property to Witcher and "Witcher said he would take that particular piece of property described in the contract. He was to take three hundred

and ten acres for $100 an acre and two and one-quarter acres at $300 an acre. . . . . Mr. Witcher said if everything was all right, the abstract of title was correct, he would take that amount of land. He made no other objection than that the abstract of title should be correct. We had been at the ranch a couple of hours driving around the premises. This particular three hundred acres was pointed out by Mr. Wilmans on the map and we drove down and saw the land. Mr. Witcher did not tell Mr. Wilmans at the ranch that he would take the land; he told him so at the hotel.'' Witcher testified that he was ready at the time the contract was made; that the purchase looked all right to him.

Now, after the plaintiff had procured for the defendant a purchaser for the land described in the contract who was able, ready and willing to take the land, there arose some question in the mind of Witcher as to whether or not the amount of land described in the contract would be sufficient for his purposes. Wilmans suggested that he would sell Witcher a half interest in the whole ranch. Merle testified that, while this proposition was pending, he went to Wilmans and asked him as to the plaintiff's commissions in case Witcher purchased half the ranch instead of that described in the contract, and that Wilmans replied: ''I will stand by my agreement; will pay you your commission as I agreed on the purchase price, which was $31,000.'' Witcher testified that he heard this conversation, and that Wilmans said: ''We will pay the commissions on the sum of $37,675 at the rate of two and one-half per cent, but that it was in reference to the three hundred and twelve and one-half acres in reference to the first deal.'' Wilmans testified in regard to this conversation with Merle: ''Then he asked about the commission; I told him that if the trade went through, if he made any trade, that I would see that he got his commission of two and one-half per cent.''

It therefore appears clear that the minds of the seller and purchaser were first brought together by the plaintiff on the sale of the lands described in the contract. It is admitted that Witcher was able to purchase. It is a significant fact that he gave Wilmans $2,400 while the contemplated sale under the contract was in progress. It is now claimed both by Wilmans and Witcher that this $2,400 was a loan and had nothing to do with the contract, but the claim that it was a loan seems to have been an afterthought. Witcher testified as to

this payment: "This thing had been dragging along from May 23d to June 24th. Mr. Wilmans stated to me that he was in need of $2,400 to pay some money due in San Francisco. . . . . I said to Mr. Wilmans, 'I have some idle money, I will lend you that $2,400; if I ever buy anything from you it can be applied to the price. If I don't, it is an ordinary loan to be returned to me when the note becomes due.'" The witness could not remember the length of time of the note, nor whether it was given by the corporation or Wilmans. Wilmans testified that he "owed some money in the bank, and I was anxious to pay it. I asked him if he would advance it and take my note for it, and if there was nothing went of this I had to pay him back." Wilmans did not remember whether he gave his personal note or the note of the corporation. No security was asked or given. The note was not produced in evidence. Before the sale of the lands described in the contract was completed the arrangement was changed at the suggestion of Wilmans, and Witcher agreed to buy the shares of capital stock of defendant corporation belonging to the Wilmans. He took an option on them in August, 1903, bought half of them in September and the balance in October of the same year. Witcher testified: "I think the suggestion that I should buy the stock of the corporation came from Mr. Wilmans." Witcher was asked: "Q. Mr. Witcher, if you had not bought the stock of the corporation, would you have purchased any part of the ranch? A. Well, I probably would have in time, though I never did get around far enough to close up the deal." Wilmans testified on the same point: "I suggested that he take the five hundred acres, and he said he would entertain it about the first day of August. I suggested to him along about the 1st of August that he take stock in the company." It is a significant fact that, although the parties had been brought together by the plaintiff, and Witcher had given the defendant $2,400, after the suggestion of the sale of the stock to the contemplated purchaser, the sale of the stock was not made until the contract with the plaintiff had expired. The sale of the stock of the corporation to Witcher was, as to the owners of the stock, the equivalent of the sale of the ranch. The sale is spoken of by Wilmans as a sale of the land. He testified: "Some of that land is not worth any $100 an acre, while there is a portion of the property would be worth $110, and some down at $80. So in fix-

ing it all up, in adjusting the value, I put it on that basis, $91.50 for the fourteen hundred acres.''

At the time the plaintiff was employed the Wilmans were the owners of all the stock of defendant and thus owned all that defendant owned. Defendant owned the ranch of fourteen hundred acres and nothing else. The Wilmans were, for the purposes of this case, the corporation, and they desired to sell the lands described in the contract and pay their debts. They did, in effect, sell the lands described in the contract, together with all the lands owned by the corporation. They sold to the purchaser found by plaintiff. The defendant promised to pay plaintiff the commissions when it made the contract, and it again promised when the contract was changed so as to include other lands. It has not paid the commission, and it is no defense that the sale was made by a different mode from that contemplated in the contract. The purchaser produced by plaintiff has, in fact, become the owner of the lands which defendant desired to sell. It is true that Witcher, who purchased the land by purchasing all the shares of the stock of defendant, was not a party to the contract, but he knew of it when he purchased the stock. He heard Wilmans promise to pay the commissions. He will not be allowed in this way to defeat the claim of plaintiff against defendant.

When the sale of the capital stock was completed Witcher retained $30,000 out of the amount to be paid by him ''as a guaranty that the company was not further obligated than what the books showed.'' The company was under the obligation to plaintiff to pay the commissions due it, whether the books showed it or not. The transaction must be stripped of all its intricacies and viewed in the light of common sense. It was, in substance, a sale of the ranch of the Wilmans to Witcher. The corporation was only the instrument by which the title was held for the owners of the capital stock, and by its duly authorized agent it agreed to pay plaintiff for its services. The services have been performed and the defendant must pay for them. If the corporation had sold the ranch to Witcher and made its deed under its corporate seal, and he had paid the money to the corporation, the title would have passed. The title is now in the corporate name of defendant, but as Witcher holds all the shares of the capital stock of defendant, he holds that which is equivalent to the title. We

therefore conclude that the findings are supported by the evidence.

The contention of the appellant that the commissions were to be paid only out of the purchase money when an actual sale should be made is without merit. The agreement was to pay plaintiff "two and one-half per cent commission on any amount for which said property shall be sold." This does not make the commissions payable only out of a particular fund. When plaintiff procured a purchaser, able, ready and willing to purchase, defendant could not by its own act, in suggesting and carrying through a different scheme, take the benefit of the plaintiff's services without compensation. Courts will not readily lend their assistance to aid parties in escaping their just liabilities through technicalities.

The order is affirmed.

We concur: Harrison, P. J.; Hall, J.